*316
 
 W. JONES, Justice.
 

 I. FACTS AND PROCEDURE
 

 This case began on June 21, 1999, when a Polish national named Zdzislow Piekarski repeatedly — and apparently without provocation — rammed his semi into the Halls’ modest home, relenting only after Mr. Hall revealed a .44 caliber pistol. Kirby and Linda Hall occupied the house, but it was owned by Basil (deceased) and Elaine Hall. Piekarski’s actions caused damage to the Halls’ residence.
 

 Fortunately for the Halls, their home was insured under a policy with limits of $63,000 purchased from Farmers Alliance Mutual Insurance Company (Farmers). Farmers assigned the claim to Julie Wilson, its employee, and an Idaho adjuster, Mike Hamon, an employee of the independent adjusting company Idaho Intermountain Claims. Hamon inspected the house on June 25 and estimated that the repairs would cost $8,383.86. On July 6, 1999, however, Wilson learned of damage to sprinkler irrigation pipes, two bedrooms, and the master bedroom. The next day, the Halls received a $1,000 advance payment for temporary living expenses. On July 9, the arrangements to repair or replace the sprinklers were made, but the Halls eventually deemed the repairs unsatisfactory.
 

 The Halls received a check for $7,633.86 on August 13, 1999 as a partial payment for the claim. However, Kirby Hall requested that the contractor return because the house had “shifted.” At this time, the Halls had yet to complete claim information paperwork necessary to finalize their claim. Because the Halls remained dissatisfied with their living situation, Farmers hired Briggs Engineering, an independent engineering company, to determine whether additional repairs were necessary. Briggs Engineering, hired in November, determined on December 14 that a few minor repairs were needed. Shortly thereafter, the Halls completed the claim information paperwork.
 

 In April 2000, the Halls made an additional claim for $57,300 for house repairs, based on a March 15, 2000 “proposal and contract” by L & L Builders. Due to the disparate estimates, Wilson arranged for an independent adjuster to re-inspect the home. The adjuster concluded that additional repairs were required, but that the Halls’ estimate was excessive. On June 26, 2000, Wilson mailed the Halls a letter informing them that their policy required the Halls’ participation in an appraisal resolution process, because they were in conflict as to the correct amount of recovery. The Halls then refused to deal with Wilson, leading Farmers to file a civil complaint against the Halls on January 24, 2001, in which Farmers successfully sought to compel the Halls’ participation. Pursuant to the appraisal process
 

 [1]
 

 each side selected an appraiser. The Halls selected Alvie Jarrett and Straightline Construction, while Farmers hired Maas Cleaning and Restoration. Jarrett and Straightline submitted a bid for $69,590.00, and Maas offered $64,395.71; so, both bids exceeded the Halls’ policy limits.
 
 [2]
 

 As a result of the corrected appraisal, Farmers revised its offer to the Halls. It
 
 *317
 
 offered the Halls a choice: (1) $36,966.17, the difference between its determination of the actual cash value of the damage and the $7,383.86 it already paid, or (2) $63,000.00, the policy limit, for the replacement value under the policy if the structure was rebuilt. The Halls did not respond to this offer. So, on June 28, 2001, Farmers sent a check for $36,966.17 to the Halls’ former attorney. After being informed on July 10 that the cheek was sent to the incorrect person, Farmers forwarded it to the correct attorney. However, the check again was returned, this time because the former attorney was still identified as a payee on the cheek. A new check eventually was issued to the correct person.
 

 At trial, the Halls argued that Farmers delayed payment to the Halls by 728 days, and Claiborne, an expert witness, testified that the claim should have taken only 60-90 days to resolve. In addition, the Halls noted that Farmers delayed in sending a structural engineer to inspect the property; that Farmers may have lied when it claimed to be unaware of the Halls’ dwelling damage; that Farmers also may have lied when it claimed to be unaware of a bid for the work from L & L Builders; and that Idaho Intermountain Claims responded to the Halls’ request to speak to the “highest person in the company” by asking whether they were referring to the tallest person and complaining that their reason to speak to the president may have been simply to “listen to the same complaints of Mr. Hall some more[.]” Farmers claimed on the other hand that the Halls were partially responsible for the delay. For example, Farmers argued that it could not possibly have completed the claim within 60-90 days, because the Halls had yet to submit a proof of claim to Farmers within that time.
 

 On February 14, 2002, the Halls filed a complaint and demand for jury trial against Farmers, alleging breach of insurance contract and the corresponding implied covenant of good faith and fair dealing; the tort of bad faith; and negligence. The trial court dismissed the claims of negligence and bad faith. The Halls moved to amend their complaint to include a punitive damages claim, and the trial court granted the motion after twice denying it. Following trial, the jury returned a Special Verdict for the Halls on April 15, 2005, awarding $18,650.00 as compensatory damages for the breach of contract claim and $660,000.00 as punitive damages.
 

 Farmers filed a motion for judgment notwithstanding the verdict, a new trial, or a remittitur. The trial court refused to grant a judgment notwithstanding the verdict, but offered either (1) to remit the punitive damages from $660,000.00 to $74,600.00, a 4:1 ratio to the compensatory damages awarded, or (2) to permit a new trial on the issue of punitive damages. The district court’s legal justification for its ruling was grounded solely on Fourteenth Amendment due process considerations, as it explicitly found that the punitive damages were not excessive apart from the due process dictates.
 
 [3]
 
 The Halls appeal the district court’s reduction of the punitive damages award. Farmers cross-appealed the court’s refusal to grant a judgment notwithstanding the verdict and its refusal to grant a new trial.
 

 II. ANALYSIS
 

 The trial court correctly denied Farmers’ motion for a judgment notwithstanding the verdict based on the insurance contract
 

 “Interpretation of an ambiguous document presents a question of fact. On the other hand, interpretation of an unambiguous document is a question of law.”
 
 DeLancey v. DeLancey,
 
 110 Idaho 63, 65, 714 P.2d 32, 34 (1986) (internal quotations omitted). Further, “[i]nsuranee policies are a matter of contract between the insurer and the insured.”
 
 AMCO Ins. Co. v. Tri-Spur Inv. Co.,
 
 140 Idaho 733, 739, 101 P.3d 226, 232 (2004). So, “[i]ntepretation of an unam
 
 *318
 
 biguous insurance contract is a question of law subject to free review.”
 
 Ryals v. State Farm Mut. Auto. Ins. Co.,
 
 134 Idaho 302, 304, 1 P.3d 803, 805 (2000). But, “where there is an ambiguity in an insurance contract, special rules of construction apply to protect the insured.”
 
 Foremost Ins. Co. v. Putzier,
 
 102 Idaho 138, 142, 627 P.2d 317, 321 (1981). “Under these special rules, insurance policies are to be construed most liberally in favor of recovery, with all ambiguities being resolved in favor of the insured.”
 
 Id.
 
 Finally, “[t]he meaning of the insurance policy and the intent of the parties must be determined from the plain meaning of the insurance policy’s own words.”
 
 National Union Fire Ins. Co. v. Dixon,
 
 141 Idaho 537, 540, 112 P.3d 825, 828 (2005).
 

 The Policy of Insurance provides the requirements for settlement of property losses as follows:
 

 4. Loss Settlement. Covered property losses are settled as follows:
 

 a. [N/A]
 

 b. Budding under Coverage A at replacement cost without deduction for depreciation, subject to the foHowing:
 

 (1)If at the time of loss the amount of
 

 insurance in this policy on the damaged building is 80% or more of the full replacement cost of the budding immediately prior to the loss, the company will pay the cost of repair or replacement, without deduction for depreciation, but not more than the smadest of the following amounts:
 

 (a) the limit of liability under this policy applying to the budding;
 

 (b) the replacement cost of that part of the budding damaged for equivalent construction and use on the same premises; or
 

 (e) the amount actuady and necessarily spent to repair or replace the damaged budding.
 

 (2) [N/A]
 

 (3) [N/A]
 

 (4) When the cost to repair or replace the damage is more than $1,000 or more than 5% of the amount of insurance in this policy on the budding, whichever is less, the company wdl pay no more than the actual cash value of the damage untd actual repair or replacement is completed
 

 The parties do not dispute that the “amount of insurance in this policy on the damaged budding is 80% or more of the full replacement cost of the budding immediately prior to the loss.” Section 4(a)(1) requires, therefore, that Farmers would have to pay the cost of repair or replacement, with payment constrained by sections 4(a)(l)(a)-(c). However, the parties also do not dispute that the cost to repair or replace the damage was more than $1,000 or more than 5% of the amount of insurance on the budding. The Hads do not claim that they have repaired or replaced their home. Therefore, Farmers should have to pay “no more than the actual cash value of the damage untd actual repair or replacement is completed.” Farmers contends that the actual cash value was $44,350.00.
 

 Finady, contrary to the statement of Ms. Wdson and the contention of the Hads, subsection (4) does not appear to “cancel out” subsection (1). Instead, it refines subsection (1), addressing the specific situation in which the cost to repair or replace the damage is more than $1,000 or more than 5% of the amount of insurance. In such a case, repair or replacement must be completed before the Hads could receive more than the actual cash value of the damage. No ambiguity exists in the podcy, rendering inapplicable the rule of construction requiring construction of the podcy in favor of recovery. Under the podcy, the Halls should be entitled only to the actual cash value of the damage untd repair or replacement is completed.
 

 However, the parties dispute the amount of the actual cash value of the damage. The podcy contains an appraisal process for determining actual cash value in case the parties do not agree. Unfortunately, for reasons that are not apparent in the record, that process was not followed, as noted in footnote 2, above. Since the two appraisers selected by the parties never selected a third appraiser or asked the court to select a third appraiser, no finding was ever made by the
 
 *319
 
 appraisers on the actual cash value. That issue was also not submitted to the jury for determination. It is clear under the policy that “actual cash value” is different from the “replacement cost.” Farmers’ obligation was only to pay the actual cash value unless and until the Halls rebuilt the home. Although Farmers tendered its determination of the actual cash value to the Halls, which was rejected, it is not clear that Farmers’ determination was correct. The jury apparently awarded the difference between what Farmers had paid prior to trial and the policy limits, but that is not necessarily the correct amount since Farmers owed only the “actual cash value” until reconstruction was accomplished. Unless the actual cash value is determined, the correct amount of compensatory damages cannot be calculated.
 

 As noted, though, Farmers did not follow its own appraisal process, a dereliction that is responsible for the confusion over the actual cash value of the damage to the Halls’ home. Nevertheless, Farmers now seeks shelter under a contractual provision that requires payment only of actual cash value until the home is rebuilt, even though Farmers was partially to blame for everyone’s ignorance regarding the actual cash value. This Court declines to allow Farmers to benefit from such tactics. Since Farmers failed to follow the appraisal process of its own policy and both appraisers agreed the damages exceeded the policy limits, we affirm the award of compensatory damages.
 

 The trial cou/rt did not abuse its discretion when it allowed the Halls to amend their complaint to include a claim for punitive damages
 

 Next, Farmers argues on its cross-appeal that the trial court abused its discretion when it allowed the Halls to amend their complaint to include a claim for punitive damages. “In any action seeking recovery of punitive damages, the claimant must prove, by clear and convincing evidence, oppressive, fraudulent, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted.” I.C. § 6-1604(1).
 

 The court shall permit a plaintiffs motion to amend the pleadings to include a prayer for punitive damages “if, after weighing the evidence presented, the court concludes that, the moving party has established at such hearing a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages.” I.C. § 6-1604(2). Whether punitive damages may be awarded depends on “whether the plaintiff is able to establish the requisite intersection of two factors: a bad act and a bad state of mind.”
 
 Myers v. Workmen’s Auto Ins. Co.,
 
 140 Idaho 495, 503, 95 P.3d 977, 985 (2004) (internal quotations omitted). Therefore, a “reasonable likelihood” must exist that the defendant performed a bad act with a bad state of mind.
 

 “It is within the discretion of a trial court to deny a motion to amend the pleadings. We review discretionary matters under an abuse of discretion standard.”
 
 Eastern Idaho Economic Development Council v. Lockwood Packaging Corp.,
 
 139 Idaho 492, 498 80 P.3d 1093, 1099 (2003). When reviewing a trial court decision for abuse of discretion, the sequence of the inquiry is: “(1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason.”
 
 Sun Valley Shopping Center, Inc. v. Idaho Power Co.,
 
 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991). The issue is whether the trial court abused its discretion in concluding that a “reasonable likelihood” existed that the evidence supported an award of punitive damages.
 

 In determining whether there was a “reasonable likelihood” that an award of punitive damages could be supported, arguments relating to the sufficiency of the evidence are moot when a properly-instructed jury returned an award of punitive damages.
 
 Vendelin v. Costco Wholesale Corp.,
 
 140 Idaho 416, 424, 95 P.3d 34, 42 (2004).
 

 Farmers argues that “the Halls offered no evidence of a harmful state of mind
 
 *320
 
 on the part of Farmers Alliance,” other than conclusory statements by the Halls’ expert.
 

 The Halls point to several instances that could support the conclusion that Farmers possessed an “evil mind.” They point to the delay of over seven hundred days, when Claiborne, their expert, testified that the industry standard was that the matter should have been concluded within ninety days. Claiborne also testified that the industry standard required Farmers to have sent the Halls a copy of their insurance policy earlier than they did. In addition, the Halls contend that Farmers should have sent a structural engineer to inspect the property earlier than they did, and that Farmers lied when claiming not to know that the Halls had problems with dwelling damage and when Farmers claimed to be unaware of a bid from L & L Builders even though evidence suggested that Farmers had received the bid a month before sending the letter. Farmers also was in possession of a bid that exceeded the policy limits when it forced the Halls to participate in the appraisal process. Finally, the Halls cite comments by an employee of Idaho Intermountain Claims that Mr. Hall wished to speak to “the highest person in the company,” which the worker joked was the tallest person in the company, and that it was for the purpose of “listen[ing] to the same complaints of Mr. Hall some more[.]”
 

 Given the above, the district court did not abuse its discretion in concluding that a reasonable likelihood existed that the evidence could support a punitive damages award. Regardless, the issue of whether the evidence could support an award of punitive damages is moot, because the jury in fact awarded punitive damages and their decision is supported by competent and substantial, although conflicting, evidence.
 

 The trial court did not err when it determined that the jury’s verdict violated Farmers’ Fourteenth Amendment right to due process
 

 We therefore turn to the constitutionality of the punitive damages award as argued by the Halls on their appeal, the first sub-issue of which is the applicable standard of review. In Idaho, “[t]he standard of review applicable to questions of law is one of deference to factual findings, but we freely examine whether statutory and constitutional requirements have been met in light of the facts as found.”
 
 State v. Hedges,
 
 143 Idaho 884, 886, 154 P.3d 1074, 1076 (2007). The U.S. Supreme Court addressed the standard of review question relating to review of punitive damages awards in
 
 Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,
 
 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). There, the Court held that “the jury’s award of punitive damages does not constitute a
 
 ‘fact’____” Id.
 
 at 437,121 S.Ct. at 1686, 149 L.Ed.2d at 687. Therefore, this Court freely reviews the constitutionality of the punitive damages award.
 

 Farmers argues that because a district court’s decision to grant a new trial is reviewed for manifest abuse of discretion, and because the district court granted a new trial in this case, this Court should review the district court for manifest abuse of discretion. However, the district court limited its grant of a new trial to the issue of punitive damages, stating that “a new trial shall be ordered on the issue of punitive damages only____” Its decision was based on its conclusion that the award was “excessive and contrary to law.” The court found the award “contrary to law” because it violated the Due Process Clause of the Fourteenth Amendment. Therefore, the decision was grounded in the Constitution, which means that this Court should freely review that decision.
 

 BMW of North America v. Gore,
 
 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) held that “[elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.”
 
 Id.
 
 at 574, 116 S.Ct. at 1598, 134 L.Ed.2d at 826. Nevertheless, a State may permit punitive damages “to further [its] legitimate interests in punishing unlawful conduct and deterring its repetition.”
 
 Id.
 
 at 568, 116 S.Ct. at 1595, 134 L.Ed.2d at 822. So, a punitive damages award will “enter the zone of arbitrariness” and thereby violate the Due Process Clause of the Fourteenth Amendment “[o]nly when
 
 *321
 
 [it] can fairly be categorized as ‘grossly excessive’ in relation to these interests.”
 
 Id.
 
 Therefore, the State’s legitimate interest in imposing the punitive damages award is the first inquiry when analyzing whether the award comports with federal due process requirements.
 
 Id.
 

 In
 
 BMW,
 
 BMW of North America failed to inform its dealers of damage to new cars when the repair costs amounted to less than 3% of the cars’ suggested retail price. Dr. Gore purchased one such BMW and discovered that his vehicle had been repainted. Accordingly, he brought suit against BMW and was awarded $4,000.00 compensatory damages and $4 Million punitive damages (remitted to $2 Million).
 
 Id.
 
 at 563-64,116 S.Ct. at 1593, 134 L.Ed.2d at 819. The Court looked to three guideposts to determine that the award was unconstitutional, to wit, “the degree of reprehensibility of the nondisclosure; the disparity between the harm or potential harm suffered by Dr. Gore and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases.”
 
 Id.
 
 at 575, 116 S.Ct. at 1598,134 L.Ed.2d at 826.
 

 First Guidepost
 

 “Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant’s conduct.”
 
 Id.
 
 Punitive damages “should reflect the enormity of the offense,” because “some wrongs are more blameworthy than others.”
 
 Id.
 
 As a result, in
 
 State Farm Mut. Auto. Ins. Co. v. Campbell,
 
 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), the U.S. Supreme Court instructed courts reviewing punitive damages awards to consider whether:
 

 the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.
 

 Id.
 
 at 419, 123 S.Ct. at 1521, 155 L.Ed.2d at 602.
 

 In addition:
 

 [t]he existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant’s culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.
 

 Id.
 

 Second Guidepost
 

 With regard to the second guidepost, i.e., the ratio between compensatory and punitive damages, “the proper inquiry is whether there is a reasonable relationship between the punitive damages award and
 
 the harm likely to result
 
 from the defendant’s conduct as well as the harm that actually has occurred.”
 
 BMW
 
 at 581, 116 S.Ct. at 1602,134 L.Ed.2d at 830 (emphasis in original). The U.S. Supreme Court has “consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual
 
 and potential
 
 damages to the punitive award.”
 
 Id.
 
 at 582, 116 S.Ct. at 1602, 134 L.Ed.2d at 830 (emphasis in original). But, “courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered.”
 
 Campbell,
 
 at 426,123 S.Ct. at 1524,155 L.Ed.2d at 606.
 

 As a result, “low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages.”
 
 BMW,
 
 at 582, 116 S.Ct. at 1602, 134 L.Ed.2d at 831. Moreover, a higher ratio “may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.”
 
 Id.
 
 The harm that potentially may have occurred from the defendant’s conduct may also validate a higher ratio.
 
 Id.
 

 
 *322
 
 Nevertheless, “in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.”
 
 Campbell,
 
 at 425, 123 S.Ct. at 1524, 155 L.Ed.2d at 605-606. Moreover, “an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety.”
 
 Id.
 

 Third Gwidepost
 

 The “third indicium of excessiveness” involves “[c]omparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct.” But, “a reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue.”
 
 BMW,
 
 at 583, 116 S.Ct. at 1603, 134 L.Ed.2d at 831. “The existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action,” but it has less utility when used to determine the amount of an award.
 
 Campbell
 
 at 428, 123 S.Ct. at 1526, 155 L.Ed.2d at 608.
 

 Application
 

 This Court first must determine Idaho’s interest in imposing punitive damages in this case, because the determination of the gross exeessiveness of a punitive damages award is made in relation to our interests in imposing the punitive damages for the relevant misconduct. The Halls posit that Idaho’s interest is “in protecting the Idaho citizenry from unscrupulous insurance companies operating in the first-party context,” because this Court has recognized that a “special relationship” exists “between an insurer and an insured.”
 
 Walston v. Monumental Life Ins. Co.,
 
 129 Idaho 211, 223, 923 P.2d 456, 468 (1996). In
 
 Walston,
 
 this Court distinguished
 
 BMW
 
 on the basis that insurance is purchased for the purpose of ensuring one’s financial security, a fact that is obviously distinguishable from purchases of fancy sports cars. There can be no dispute that Idaho has a legitimate interest in preventing the exploitation of its citizens by punishing insurance companies that exploit the vulnerability of their insureds. Given the existence of this interest, the next step is to apply the U.S. Supreme Court’s three guideposts to determine whether the jury’s $660,000.00 award was grossly excessive.
 

 Degree of Reprehensibility
 

 Obviously this case does not involve acts of violence by Farmers, which means that Farmers’ actions cannot be deemed more blameworthy on that basis. The question, then, is whether Farmers’ actions can be described as either acts of “trickery or deceit” or repeated acts of misconduct. If so, then their actions were more reprehensible. Farmers’ alleged delay tactics served as the Halls’ primary evidence supporting punitive damages; therefore, it should be determined whether such conduct was reprehensible.
 
 [4]
 
 The Halls point to no persuasive evidence that leads to the conclusion that Farmers’ alleged delay tactics occurred on numerous occasions. Nevertheless, it is clear that if an insurance company intentionally delays an insured’s recovery, such actions could qualify as “trickery or deceit,” because the insurance company would essentially be tricking (or deceiving) its insured into needlessly accepting the delay. The U.S. Supreme Court has determined that such conduct is more blameworthy, which suggests that this guidepost points to the constitutionality of the award.
 

 Still, the Halls must overcome the presumption that they were made whole by their compensatory damages, which means that Farmers’ alleged conduct must have been so reprehensible that additional sanctions are required in order to achieve punishment or deterrence. In this case, the compensatory award compensated the Halls to the maximum extent that their policy permitted. However, if an insurance company could delay payment of a claim without repercussions extending beyond the amount it owed in the
 
 *323
 
 first place, an
 
 incentive
 
 to delay would exist. Therefore, this case provides a paradigm example of when punitive damages are needed to effect the legitimate goal of deterring such conduct.
 

 Ratio between compensatory award and punitive award
 

 Here, the ratio is approximately 35:1. Therefore, the award is presumptively unconstitutional, considering that it is roughly four times the maximum single-digit ratio (9:1) that the Supreme Court suggested would rarely withstand constitutional scrutiny, and it is roughly nine times the ratio (4:1) that “might be close to the line of constitutional impropriety.” There must be some justification for the inordinately disproportionate ratio. Accordingly, the U.S. Supreme Court’s examples of situations that may justify a higher ratio will now be discussed.
 

 First of all, this case does not involve a situation in which the injury was difficult to detect or the value of noneconomic harm was difficult to determine. The jury was presented with a breach of contract claim, and no personal injury or other noneconomic harm was considered by the jury. The reason that the injury was not difficult to detect in this case is that the Halls were simply injured to the extent that they did not quickly receive the whole of their insurance coverage. Therefore, the amount of the injury was simple to determine: subtract the amount received from the amount owed.
 

 Secondly, it must be determined whether a particularly egregious act resulted in a small amount of economic damages. Note that the act that the Supreme Court describes is not simply “regretful,” “naughty,” “unscrupulous,” or the like. It is a
 
 particularly egregious
 
 act. While it is true that insurance delay tactics may be highly inconsiderate and perhaps even exploitive, they were not “particularly egregious” in this case. A delay of approximately two years, the purported lies of Farmers, and the Halls’ other justifications for punitive damages may warrant a punitive result, but they cannot be characterized as so
 
 particularly egregious
 
 that they justify an award over eight times the ratio that “might be close to the line of constitutional impropriety.”
 

 Comparison of punitive award with other penalties for comparable misconduct
 

 Walston v. Monumental Life Ins. Co.,
 
 129 Idaho 211, 923 P.2d 456 (1996) is the only authority the Halls cite in support of then-position that this guidepost suggests upholding the jury’s punitive damages award. In that case, this Court stated that
 

 In Idaho punitive damages have long been allowed, and the special relationship between an insurer and an insured has been well defined. The state has set standards of practice in the insurance industry. There is no doubt that Monumental knew, if it paid attention, that severe penalties could follow from fraud in marketing and bad faith denial of benefits practices.
 

 Walston,
 
 129 Idaho at 223, 923 P.2d at 468.
 

 This cited language from
 
 Walston
 
 only supports the proposition that Farmers may have been on notice that punitive damages could be awarded for fraud in marketing and bad faith denial of benefits. It does not compare the civil or criminal penalties with the punitive award imposed by the jury. The Halls therefore have cited no authority to support the conclusion that other civil or criminal awards in Idaho were comparable to those imposed by the jury in this ease. “Issues on appeal ... that are not supported by propositions of law or authority are deemed waived and will not be considered by the Supreme Court.”
 
 Student Loan Fund of Idaho, Inc. v. DesFosses,
 
 138 Idaho 855, 859, 71 P.3d 454, 458 (2003). Therefore, this Court will not consider Halls’ arguments regarding this guidepost.
 

 Because only one of the guideposts partially supports the conclusion that the jury’s punitive damages award was consistent with the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, this Court affirms the district court’s decision to remit the award to a 4:1 ratio. While the “most important” guidepost lends some support to the Halls’ position, the Halls’ support for the other two guideposts is nowhere close to being sufficient to meet the constitutional due process requirements. Because a new
 
 *324
 
 trial on the sole issue of punitive damages would be pointless, this Court vacates the district court’s decision to allow the Halls this “option.”
 

 The trial court did not err when it refused to grant Farmers’ motion for JNOV
 

 Farmers next argues on its cross-appeal that the trial court erred when it failed to grant its motion for JNOV. “The real issue under the JNOV is whether, giving deference to the district court and drawing all inferences in favor of the jury’s verdict, there is substantial and competent evidence to support the verdict.”
 
 Horner v. Sani-Top, Inc.,
 
 143 Idaho 230, 238, 141 P.3d 1099, 1107 (2006). “The standard of review of a grant or denial of a motion for JNOV is the same as that of the trial court when ruling on the motion.”
 
 Gillingham Const., Inc. v. Newby-Wiggins Const., Inc.,
 
 142 Idaho 15, 21, 121 P.3d 946, 951 (2005). “A jury verdict must be upheld if there is evidence of sufficient quantity and probative value that reasonable minds could have reached a similar conclusion to that of the jury.”
 
 Id.
 
 “In reviewing a grant or denial of a motion for JNOV the court may not reweigh evidence, consider witness credibility, or compare its factual findings with that of the jury.”
 
 Id.
 
 “The court reviews the facts as if the moving party had admitted any adverse facts, drawing reasonable inferences in favor of the non-moving party.”
 
 Id.
 

 Farmers attempts to justify its contention that the JNOV should have been awarded by contesting whether many of the facts indicated an evil mind on the part of Farmers. For example, they state that their failure to produce a duplicate policy for the Halls was excusable because “Farmers Alliance can’t be blamed for [the Halls’] misplacement of the policy.” However, Claiborne testified that the industry standard was that Farmers should have sent a policy sooner. In addition, Farmers disputes that Wilson lied to the Halls; however, Farmers’ entire argument to this effect is that “Neither is supported by the facts of the case.” It is not an appellate court’s role to reweigh facts already determined by the jury. When one draws all inferences in favor of the jury’s verdict, one must conclude that there is substantial and competent evidence to support that verdict.
 

 The trial court properly instructed the jury on the issue of punitive damages
 

 The next issue raised by Farmers on its cross-appeal is whether the trial court properly instructed the jury on the issue of punitive damages. “The question of whether the jury was properly instructed is a question of law over which we exercise free review.”
 
 State v. Gleason,
 
 123 Idaho 62, 65, 844 P.2d 691, 695 (1992).
 

 The district court recited instruction number 15 to the jury as follows: “in every contract, there is an implied obligation of good faith and dealing
 
 [5]
 
 on the part of both parties. The covenant requires that the parties perform, in good faith, the obligations imposed by their agreement.” Farmers objected to this instruction on the grounds that it “introduces the concept of bad faith in this case. That’s the opposite of good faith, and we didn’t try that.” In addition, Farmers argues that the district court inappropriately introduced the concept of negligence in instruction number 23.
 
 [6]
 
 Farmers argued that
 
 *325
 
 “Although this was an instruction that I submitted, I didn’t have a chance to review it fully. I think on the second line in the definition of willful and wanton, it uses the terms reckless actions. And, again, I think that then introduces the element of negligence in this case.” Finally, Farmers argues that the district court “failed to instruct the jury on the need to find an evil intent on Farmers Alliance in order to award punitive damages as had been requested.”
 

 However, as the district court noted, “[t]he implied covenant of good faith and fair dealing is a covenant implied by law in the parties’ contract.”
 
 Lettunich v. Key Bank Nat. Ass’n,
 
 141 Idaho 362, 368, 109 P.3d 1104, 1110 (2005). Moreover, the 1987 version of Idaho Code § 6-1604 — the version relevant here — set the standard for punitive damages awards as proof by a preponderance of the evidence of the existence of “oppressive, fraudulent, wanton, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted.”
 
 [7]
 
 Act of 1987, ch. 278, S.L. p 576. For this reason, the district court was correct in instructing the jury on the concept of the implied covenant of good faith in contract cases, as this case involved an alleged breach of contract.
 

 In addition, the district court properly instructed the jury with regard to the term “reckless.” First, “reckless” is not synonymous with “negligent,” as is made clear by
 
 Hunter v. Horton,
 
 80 Idaho 475, 479-80, 333 P.2d 459, 462-63 (1958), which states that “[rjeckless misconduct differs from negligence in several important particulars.” Secondly, the district court equated recklessness with wantonness, stating that “[t]he word ‘wanton’ when used in these instructions ... means intentional or reckless actions taken under the circumstances where the actor knew or should have known that the actions not only created damages to another, but involved a high degree of probability that such damages would actually be resolved.” Since “wanton” clearly is not equivalent to “negligent,” and since “wanton” was equated to “reckless,” the instruction on “reckless” was not in danger of being confused with “negligent.” Therefore, the instruction was not an error.
 

 III. CONCLUSION
 

 For the foregoing reasons, we affirm the district court’s compensatory damages award of $18,650.00, as well as the remitted punitive damages award of $74,600. The district court’s decision to allow the Halls a new trial on the issue of punitive damages is vacated. No costs are awarded to either party.
 

 Chief Justice EISMANN, Justices J. JONES, J. HORTON and Justice Pro Tern TROUT concur.
 

 [1]
 

 . The process is described as follows:
 

 Appraisals in case the insured and this company shall fail to agree as to the actual cash value on the amount of loss, when, on written demand of either, each shall select a competent and disinterested appraiser and notify the other of the appraiser selected within twenty days of such demand. The appraisers shall first select a competent and disinterested umpire; and failing for fifteen days to agree upon such umpire, then, on request of the insured or this company, such umpire shall be selected by a judge of a court of record in the state in which the property covered is located. The appraiser shall then appraise the loss, stating separately actual cash value and loss to each item; and, failing to agree, shall submit their differences, only, to the umpire. An award is (sic) writing, so itemized, of any two when filed with this company shall determine the amount of actual cash value and loss. Each appraiser shall be paid by the party selecting him and the expenses of appraisal and umpire shall be paid by the parties equally.
 

 [2]
 

 . The parties appear not to have fully adhered to the process described in footnote 1, because no disinterested umpire was ever selected by the appraisers. It is unclear why the parties did not fully adhere to the process, but it may have been because both appraisers’ bids exceeded the policy limits, arguably rendering irrelevant the amount that the umpire would have determined to be correct.
 

 [3]
 

 . This ruling appears rather perplexing, given that the district court seems to have found that $74,600.00 was the maximum constitutionally permissible amount of punitive damages, since it believed that the damages were not excessive based on non-due process considerations. It would follow, therefore, that a new trial could not possibly produce an award exceeding $74,600.00, as such an award would be unconstitutional under the district court’s analysis. Therefore, since the new trial could not constitutionally produce a more lucrative result for the Halls, the "option” for a new trial was not an option at all.
 

 [4]
 

 . Farmers argued that the Halls contributed to the delay of the claim, but the jury seems to have rejected the argument that the Halls’ alleged contribution to the delay negated the justification for a punitive damages award.
 

 [5]
 

 . Instruction number 15 did not use the traditional terminology, i.e., "fair dealing.”
 

 [6]
 

 . In instruction number 21, the judge applied the suggested instruction under IDJI 9.20 when he instructed the jury on the punitive damages matter as follows:
 

 If you find that the defendant's acts which proximately cause (sic) injury to the plaintiffs in the breach of contract claim were an extreme deviation from reasonable standards of conduct and that these acts were performed by the defendant with malice or oppression or wantonness, you may, in addition to any compensatory damages to which you find the plaintiffs entitled, award to plaintiffs an amount that will punish the defendant and deter the defendant and others from engaging in similar conduct in the future.
 

 Instruction number 23 substantially complied with the IDJI 2.25 definition of “willful and wanton.” The IDJI definition is as follows:
 

 The words "willful and wanton” when used in these instructions and when applied to the allegations in this case, mean more than ordinary negligence. The words mean intentional or reckless actions, taken under circumstances where the actor knew or should have known
 
 *325
 
 that the actions not only created an unreasonable risk of harm to another, but involved a high degree of probability that such harm would actually result.
 

 Instruction number 23 reads as follows:
 

 The word “wanton” when used in these instructions and when applied to the allegations in this case, means intentional or reckless actions taken under the circumstances where the actor knew or should have known that the actions not only created damages to another, but involved a high degree of probability that such damages would actually be resolved.
 

 [7]
 

 . The current version requires proof by clear and convincing evidence, and it does not include the word "wanton.”