**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 36863**

| | |
|---|---|
| IN THE MATTER OF: JANE DOE, JOHN DOE, JANE DOE I, CHILDREN UNDER THE AGE OF EIGHTEEN YEARS. ) ) ) | |
| ------------------------------------------------------- ) | |
| IDAHO DEPARTMENT OF HEALTH & WELFARE, ) ) ) | |
| Petitioner-Respondent. ) | Boise, June 2010 Term |
| ) | |
| v. ) | 2010 Opinion No. 75 |
| ) | |
| JANE DOE II, ) | Filed: June 30, 2010 |
| ) | |
| Respondent, ) | Stephen W. Kenyon, Clerk |
| ) | |
| and ) | |
| ) | |
| JOHN DOE I, ) | |
| ) | |
| Respondent-Appellant. ) | |
| ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Carolyn Marie Minder, Magistrate Judge.

Termination of parental rights to three children, affirmed.

Joseph Lynn Ellsworth, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent.

---

**SUBMITTED ON THE BRIEFS**

BURDICK, Justice

This case involves the termination of the parental rights of John Doe (Doe) as to his three children, A.D., Ju.D., and Je.D.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

1

A.D. was born in 2004; Ju.D. was born in 2005; and Je.D. was born in 2007. At the time of Je.D.'s birth, both Je.D. and the mother tested positive for methamphetamine. The three children were declared in imminent danger on March 26, 2007, and placed in foster care.

On July 13, 2007, an Amended Petition for Hearing under the Child Protective Act was filed, and Doe was named as the biological father of the children. Count II of the Petition alleged that the "father's use and abuse of controlled substances impairs his ability to provide proper parental care and control for his children." A permanency hearing was held on March 20, 2008, and termination of parental rights and adoption was ordered due to the parents' repeated failures to comply with their case plans and their ongoing drug use. A Motion to Modify the Permanent Plan was filed April 17, 2008. On May 14, 2008, the magistrate court modified the permanent plan, providing for a short extension of foster care with a plan of return to home because the parents had begun compliance with the case plan and had not used methamphetamine for several months. The court held reviews every thirty to forty-five days from May until December, and the parents did not test positive for methamphetamine. On December 12, 2008, the child protection case was vacated.

However, on March 11, 2009, Je.D. was admitted to St. Luke's Hospital and tested positive for methamphetamine. Hospital staff ordered the drug test based on observations of "suspicious behavior" by Je.D. and the parents. The pediatric nurse testified that Je.D.'s behavior was consistent with that of a child withdrawing from drugs:

> [Je.D.] was an extremely agitated patient. She was constantly—I noticed she was constantly screaming, first off. You could hear her down the hall, screaming, screaming, screaming. She was attempting to try to gouge out her eyes with her sippy cup. She was continuously biting at her IV lines, biting—attempting to bite staff.
>
> She was just flailing about in the bed. She would try to body slam herself down into her pillow, into her side rails. She was just extremely, extremely agitated. The worse [sic]—actually the worse [sic] that I've ever seen.
>
> . . . .
>
> And as I talked with the doctor, and we were both discussing why this could be happening, I had mentioned that I wondered if she was withdrawing off of drugs. And the doctor did follow up on that concern.

During the time Je.D. was in the hospital, the parents also left her for extended amounts of time. The lab results returned on April 27, 2009, indicated that Je.D. tested positive for methamphetamine. On April 28 and 29, the parents were contacted by the State and asked to

submit to immediate drug testing, which they refused. On April 30, the parents again refused to be drug tested, continuing to make excuses for their unwillingness to be tested.

On May 1, 2009, a Petition for Hearing under the Child Protective Act was filed and the State attempted to locate the children. The parents surrendered the children on May 4, 2009, and also submitted to hair follicle testing on that date. Doe, A.D., and Je.D. tested positive for methamphetamine, and Ju.D. was not tested. The parents then refused to submit to any additional drug testing until June 4, 2009, and between then and the hearings on termination, missed half of their required tests. The parents also did not show up at the Department of Health and Welfare (Department) for a scheduled visitation with their children on May 15, 2009.

An Amended Petition for Hearing under Child Protective Act was filed June 2, 2009, and Count I stated:

> The children, [A.D.] and [Je.D.], are neglected as they are without proper parental care and control necessary for her [sic] well-being because of the conduct or omission of her [sic] parents, as follows: Hair follicle tests for controlled substances performed on the children came back positive for methamphetamine, which is not justifiably explained, and the mother and the father have a history of use and/or abuse of controlled substances.

Count II stated that the court may take jurisdiction over Ju.D. pursuant to I.C. § 16-1603(2).

The Petition for Termination of Parent-Child Relationship was filed June 26, 2009. It alleged that termination would be in the children's best interest based on neglect; specifically, "[t]he mother and the father's history and/or on-going use and abuse of controlled substances has resulted in the children being placed in foster care for seventeen (17) of the last twenty-two (22) months."

The termination hearings were held July 22, July 23, and August 10, 2009. The following thirteen witnesses were called: (1) Laura Bessey, social worker; (2) Marcia Brothers, guardian ad litem; (3) Kristin Brown, pediatric nurse; (4) Pamela Derby, social worker; (5) David Engelhart, laboratory director for Omega Laboratories; (6) Gina Hunsaker, social worker; (7) Cindy Hunt, custodian of records for Weinhoff Drug Testing; (8) Tara Kalar, specimen collector for Weinhoff Drug Testing; (9) Michelle Lancaster, foster parent; (10) Gary Lee, drug tester for Weinhoff Drug Testing; (11) Diana Rogan, case manager at St. Luke's Hospital; (12) Sue Rose Salmon, substance abuse counselor; and (13) Shawna Tubach, pediatrician. The court issued its Order Terminating Parental Rights of [the Parents] on August 19, 2009. The court's

Findings of Fact, Conclusions of Law and Decree as to the Father was issued on August 25, 2009, terminating Doe's parental rights. Doe timely filed his Notice of Appeal.

## II.  ANALYSIS

### A.  The magistrate court did not err in admitting the hair follicle and urine test results.[1]

#### 1.  Standard of review

A trial court's determination that evidence is supported by proper foundation is reviewed for an abuse of discretion. *Vendelin v. Costco Wholesale Corp.*, 140 Idaho 416, 429, 95 P.3d 34, 47 (2004). The decision will be upheld if it appears that the trial court (1) correctly perceived the issue as discretionary, (2) acted within the boundaries of its discretion and consistent with the applicable legal standards, and (3) reached its determination through an exercise of reason. *Eby v. State*, 148 Idaho 731, __, 228 P.3d 998, 1001 (2010).

#### 2.  The hair follicle tests were properly admitted.

"[T]he appropriate test for measuring the scientific reliability of evidence is I.R.E. 702." *State v. Gleason*, 123 Idaho 62, 65, 844 P.2d 691, 694 (1992). Idaho Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

"Formal training is not necessary, but practical experience or special knowledge must be shown to bring a witness within the category of an expert." *Weeks v. E. Idaho Health Servs.*, 143 Idaho 834, 837, 153 P.3d 1180, 1183 (2007). This Court has not adopted the standard that a scientific theory must be commonly agreed upon or generally accepted. *Id.* at 838, 153 P.3d at 1184. "Thus, '[t]he question under the evidence rule is simply whether the expert's knowledge will assist the trier of fact; not whether the information upon which the expert's opinion is based is commonly agreed upon.'" *Id.* (quoting *State v. Merwin*, 131 Idaho 642, 646, 962 P.2d 1026, 1030 (1998) (alteration in original).

In *Coombs v. Curnow*, this Court found that a doctor's opinion as to the cause of the victim's death "was scientifically reliable" where the doctor "testified that his opinion was based on basic principles of medicine that he learned in medical school and while working in the ICU";

---

[1] No arguments were made by Doe regarding the admission of the urine test results in his brief on appeal; instead, he focused solely on the hair follicle test results.

4

was a board certified pediatrician, anesthesiologist, and professor of anesthesiology and pediatrics at Stanford Medical School; and had authored numerous journal articles and textbook chapters on various subjects including those at issue. 148 Idaho 129, __, 219 P.3d 453, 466-67 (2009). The Court found that "[b]ased on these facts, it is reasonable to conclude [the doctor] was familiar enough with basic principles of medicine to form his opinion." *Id.* at __, 219 P.3d at 466.

In this case, we hold that the magistrate court's decision to admit the hair follicle testing results was within its discretion as the testimony offered by Dr. Engelhart and the employees of Weinhoff Drug Testing demonstrated the scientific reliability of the evidence. Gary Lee, a drug tester for Weinhoff Drug Testing, testified as to the process for collecting a hair sample. Lee then testified that Petitioner's Exhibit 10 was the chain of custody form for Doe, and that he witnessed that the proper procedures were followed when Doe's hair was cut for the hair follicle test. Counsel for Doe objected to the admission of the exhibit on the basis that Doe had not initialed the chain of custody form as to the accuracy of the sample. The court conditionally admitted the form, "recognizing that there is an infirmity, in the sense that there is no confirmation that [Doe] did, in fact, initial, and there may be a part 2 [to the form]." Tara Kalar also testified as to the collection procedures followed at Weinhoff Drug Testing in general and the specific hair follicle collection for A.D. and Je.D.

The signed donor section of the chain of custody forms for Doe, A.D., and Je.D. were then introduced as Petitioner's Exhibit 14 through the testimony of Cindy Hunt, who stated that on the form "the donor acknowledges that it is their specimen, it's not adulterated, it was sealed in front of them, and the information—the rest of the information on the form is correct. And they sign it, print their name, the date of the collection, they're asked for a daytime and evening phone number, and their date of birth." Counsel for Doe did not object to the admission of the exhibit. Counsel did object to the admission of Petitioner's Exhibit 13, which included no-show calendars for Doe, as well as three positive test results, on the basis that "we don't have any information, from the labs themselves, as to the accuracy of the test results or the procedure that was used to document those results. We simply have a –basically a transcription of what those results are from someone else. So, there is a –a significant piece of foundational evidence missing with regard to these test results." This foundation was then provided through the testimony of Dr. Engelhart, which occurred later in the hearings.

5

Dr. Engelhart testified as to the accuracy of the test results and the procedures that were used to document the results. He also testified as to his training and experience, which included a Ph.D. in Chemistry, eleven years experience doing toxicology, and over four years as the lab director for Omega Laboratories, which does exclusively hair follicle testing for drugs. Dr. Engelhart was also questioned about Omega Laboratories's certifications and he stated that the laboratory is certified for hair follicle testing by the New York State Department of Health, and by the Clinical Laboratory Improvement Amendments. Petitioner's Exhibits 15 and 16, the test results from Omega Laboratories, were admitted based on Dr. Engelhart's testimony. Counsel for Doe objected to the admission of the last two pages of the test results on the basis that there was no testimony concerning them and the court stated that it would give no weight to those two pages of the exhibits, but would leave the exhibits intact. Outside of that objection, counsel for Doe did not object to Dr. Engelhart's testimony.

We find that there is ample support in the record to affirm the district court's decision to admit the hair follicle testing results. The testimony of each expert witness was based on their individual knowledge, education, and training. Therefore, the testimony satisfied the requirements of I.R.E. 702 and was supported by adequate foundation. As the State summed up in its brief on appeal:

> Through the testimony of several witnesses, the State established a chain of custody for the collection of the samples; that a standardized procedure was followed in the collection of each of the samples; that each sample was assigned a number for identification; that each sample was labeled and marked at various stages of the procedure for identification of the sample; that the samples were sent to Omega Laboratories for testing; that Omega Laboratories received the samples and conducted drug testing on each of the samples; that Omega Laboratories followed a standardized procedure to identify and test each of the samples; that Omega Laboratories utilized two forms of testing in the process, enzyme-amino assay techniques and gas chromatography mass spectrometry (GCMS); and that GCMS is the standard confirmatory test for the drug testing industry.

Moreover, the district court recognized its discretionary role in admitting the evidence; it acted within the boundaries of its discretion and consistently with the applicable legal standards by ensuring that each expert was adequately qualified to provide such testimony; and it based its decision on an exercise of reason.

**B. The magistrate court's termination of Doe's parental rights was based on substantial and competent evidence.**

    **1. Standard of review**

"When the State intervenes to terminate the parent-child relationship, the requisites of due process must be met. This requirement necessitates the State prove the grounds for terminating a parent-child relationship by clear and convincing evidence." *In re Doe*, 143 Idaho 343, 345, 144 P.3d 597, 599 (2006) (internal citation omitted). "[W]here the trial court has explicitly determined the case by application of the clear and convincing evidentiary standard, this Court must determine if the decision was supported by substantial and competent evidence." *In re Doe*, 146 Idaho 759, 761, 203 P.3d 689, 691 (2009). Substantial competent evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Folks v. Moscow Sch. Dist. No. 281*, 129 Idaho 833, 836, 933 P.2d 642, 645 (1997) (quoting *Welch v. Cowles Publ'g Co.*, 127 Idaho 361, 365, 900 P.2d 1372, 1376 (1995)).

2. **Substantial and competent evidence existed that termination of Doe's parental rights was in the best interest of the children.**

Idaho's Termination of Parent and Child Relationship Act includes in its purpose:

> Implicit in this chapter is the philosophy that wherever possible family life should be strengthened and preserved and that the issue of severing the parent and child relationship is of such vital importance as to require a judicial determination in place of attempts at severance by contractual arrangements, express or implied, for the surrender and relinquishment of children.

I.C. § 16-2001(2). In that spirit, I.C. § 16-2005 permits the Department to petition the court for termination of the parent-child relationship when it is in the child's best interest and one of the following factors exist: (a) abandonment, (b) neglect or abuse, (c) lack of a biological relationship between the child and a presumptive parent, (d) inability to discharge parental responsibilities, or (e) incarceration of parent for a substantial period of time during the child's minority. The magistrate court here found that the Department proved, by clear and convincing evidence, neglect as defined in I.C. §§ 16-2002(3)(a) and 16-1602(25), as well as I.C. § 16-2002(3)(b), and that termination was in the best interest of the children.

Idaho Code § 16-2002(3)(a) provides that "neglected" means conduct as defined in I.C. § 16-1602(25), which includes, in relevant part, a child who:

> [I]s without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or omission of his parents, guardian or other custodian or their neglect or refusal to provide them . . . or. . . [w]hose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being.

I.C. § 16-1602(25)(a)-(b). Idaho Code § 16-2002(3)(b) defines "neglected" as "[t]he parent has failed to comply with the court's orders in a child protective act case or the case plan, and reunification of the child with his or her parent(s) has not occurred within the time standards set forth in section 16-1629(9), Idaho Code." Idaho Code § 16-1629(9) states:

> There shall be a rebuttable presumption that if a child is placed in the custody of the department and was also placed in out of the home care for a period not less than fifteen (15) out of the last twenty-two (22) months from the date the child entered shelter care, the department shall initiate a petition for termination of parental rights. This presumption may be rebutted by a finding of the court that the filing of a petition for termination of parental rights would not be in the best interests of the child or reasonable efforts have not been provided to reunite the child with his family, or the child is placed permanently with a relative.

This statute "merely creates a presumption in favor of the department initiating a termination petition when a child has been in the state's custody and not in the parent's care for fifteen out of twenty-two months. It does not create a presumption that it is in the best interests of the child to terminate parental rights." *State v. Doe*, 144 Idaho 534, 536, 164 P.3d 814, 816 (2007).

The magistrate court here based its determination that termination of parental rights was in the best interest of the children on the parents' "history and/or ongoing use and abuse of controlled substances, which has resulted in the children being in foster care for seventeen (17) of the last twenty-two (22) months as of June 26, 2009."

Evidence regarding Doe's "history and/or ongoing use and abuse of controlled substances" included the previous Child Protection Act proceedings; his positive test results for methamphetamine from May 4, 2009, July 18, 2009, and July 23, 2009; and his refusal to submit to testing on other required test dates. In addition to this evidence, hospital staff, social workers, the guardian ad litem, and the foster mother testified regarding their interactions and experiences with the children and the parents.

The guardian ad litem testified as to how the children behaved during her visits with them, beginning on May 18, 2009. She stated that A.D. "tries to control everything around her, which is very common with children that feel like they don't have control over situations. And I guess the best words I would use to describe her would be sad, confused, and responsible." Ju.D. was described as follows:

> [Ju.D.] is sad, he runs away and hides. He's very with—withdrawn. He's angry, he's disruptive. He has poor impulse control. And he has cognitive and speech problems. You shouldn't diagnose a kid this young, and I don't like to label kids anyways, but he would meet all the criteria for oppositional defiant disorder.

The guardian ad litem further stated that Ju.D. "functions at about 18 to 24-month level, and he's 42 months old, and he's even further behind in his speech." Finally, with regard to Je.D., the guardian ad litem testified:

> She has some mild speech and definite sens—sensory issues. She seemed not to have a startle response to loud noises, which is a sensory kind of thing. She seems to have a high pain tolerance. . . from a sensory issue perspective, she doesn't seem quite right for her age. Her speech is not within recommended ranges for a child her—her age.

The guardian ad litem also stated that at the visits she observed with the parents, the parents "seemed to be very overwhelmed."

> The guardian ad litem recommended that parental rights be terminated:

> There's no doubt in my mind that [the mother] and [Doe] love their children very much and that their children love them. That's clear. They do—they—they, you know, they show affection toward each other.

> However, the first five years are critical to a child's development, especially when the child has been subjected to in-utero substances.

> [The children] do not have the luxury to wait for their parents to be physically, emotionally, or cognitively available to them. Their parents have a long history of broad-based problems. They've been—they have had substantial services to help them and to try to keep their family together, and the parents are either unwilling or unable to address the issues that prevent them from being able to parent their children.

> As a result, I believe it would be in the best interest of the children for the parental rights to be terminated.

The children's foster mom also testified as to their behavior. She stated that when Je.D. was first returned to her parents at 18 months of age, she was a "[v]ery vibrant little girl, was learning how to feed herself. She would take time out with no problem. And she was just a very happy little girl." When Je.D. was returned to the foster home seven months later, the foster mom testified that she had many behavioral issues:

> She has an extreme temper problem, she was hurting herself. When it came for time out, she was throwing her head against the wall, and throwing herself back against the floor. And sometimes, just out of the blue, would just starting [sic] screaming and throwing herself on the floor for no reason.

Regarding Je.D.'s speech, the foster mom stated:

> She was delayed from when—after she left our home. She was saying thank you, please, with no problem, automatically when she got a drink or whatever she was handed to [sic]. When she came back to me, she refused to say please, just thank

9

you. . . . She was actually drop—starting to drop her first syllables with her words, and that concerned me.

When Ju.D. was initially in foster care, the foster parents had concerns about his speech and he is currently in special education preschool. He also exhibited aggressive behaviors such as biting and hitting when he was returned to foster care. When A.D. was returned to foster care, at age five, she did not know how to count to ten or know her "ABCs."

Social worker Pamela Derby also testified that it would be in the children's best interest to terminate parental rights:

> I know that [the parents] love their kids, but I've had a lot of experience with methamphetamine, and they are unavailable to their children due to drug usage. And that's been ongoing for too long. We've got [Je.D.] that's already a methamphetamine addict. . . . Parents that are using and abusing substances are absent. They may be physically present, but they're –they're absent emotionally and mentally. They are unable to take care of the needs of their children. Usually, in these families, the oldest one starts being very parentified and start taking care of children. And in—in my experience, if you are unable to stay sober for—in this case, we have been unable to stay sober for two years.

In a thirty-page Memorandum Decision, the magistrate court discussed in detail the previous case involving the family, as well as the testimony of the hospital staff, the case workers, the substance abuse counselor, the guardian ad litem, the foster mother, and Dr. Engelhart. The magistrate court thus based its determination that termination of Doe's parental rights was in the best interest of the children upon substantial and competent evidence.

## III. CONCLUSION

This Court affirms the magistrate court's order terminating Doe's parental rights to A.D., Ju.D., and Je.D. Costs to Respondent.

Chief Justice EISMANN and Justices J. JONES, W. JONES and KIDWELL, Pro tem, **CONCUR.**

10