# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 44010-2016

| | | |
|---|---|---|
| IDAHO DEPARTMENT OF HEALTH AND WELFARE, | ) ) ) | Boise, June 2016 Term |
| Petitioner-Respondent, | ) ) | 2016 Opinion No. 77 |
| v. | ) ) | Filed: July 22, 2016 |
| JOHN DOE (2016-09), | ) ) | Stephen W. Kenyon, Clerk |
| Respondent-Appellant | ) ) | |
| and | ) ) | |
| JANE DOE, | ) ) | |
| Respondent, | ) ) | |
| and | ) ) | |
| CASA, guardian ad litem, | ) ) | |
| Intervenor-Respondent. | ) ) | |

Appeal from the District Court of the First Judicial District of the State of Idaho, in and for Bonner County. Hon. Debra A. Heise, Magistrate Judge.

The judgment of the magistrate court is affirmed.

Monica F. Brennan, James Vernon & Weeks, P.A., Coeur d'Alene, argued for appellant.

Denise L. Rosen, Deputy Attorney General, Coeur d'Alene, argued for respondent.

_____

PER CURIAM.

This is an appeal out of Kootenai County from a judgment terminating a father's parental rights in his three minor children. We affirm the judgment of the magistrate court.

# I.
## Factual Background.

In 2006, John Doe ("Father") and Mother were the parents of three minor daughters who were approximately 5, 6, and 7 years of age. On August 8, 2006, a federal grand jury in Idaho issued an indictment charging Father with "caus[ing] another to travel in interstate commerce from California to Idaho, with the intent that murder be committed in violation of the laws of the United States and the State of Idaho." The indictment alleged that Father had agreed to pay another person $10,000 to murder Mother. A jury found Father guilty of the offense, and in a judgment entered on August 8, 2006, the federal court sentenced him to 120 months in the custody of the United States Bureau of Prisons and three years of supervision following his release from prison. The federal court also sentenced him to a fine of $17,500.

Following Father's arrest and incarceration, Mother had sole custody of their three minor daughters. Mother also had custody of her son from a prior marriage, but he will not be further mentioned because he turned eighteen years of age before the termination proceedings were commenced.

On July 21, 2013, the three daughters were approximately 12, 13, and 14 years of age. The oldest daughter was still hospitalized following her suicide attempt. On that date, a Sandpoint police officer received information that Mother had stabbed herself in the face with a pen and had been talking about killing herself. After investigating the matter, the officer took Mother to the hospital, and he took the two younger daughters into shelter care.

On July 23, 2013, the prosecuting attorney filed a petition under the Child Protective Act (CPA) regarding the two younger daughters. The shelter care hearing was held the same day before Magistrate Judge Lori T. Meulenberg. A public defender had been appointed to represent both Mother and Father. Father appeared by telephone from prison and requested appointment of separate counsel. Therefore, the public defender represented Mother and separate counsel was later appointed to represent Father. All parties stipulated that the two children came within the jurisdiction of the court due to an unstable home environment. The Department of Health and Welfare ("Department") requested that they remain in shelter care, but Father objected and requested that they be placed with his adult son in Arizona. At the conclusion of the hearing, the court ordered that the two children be placed in the temporary legal custody of the Department.

The adjudicatory hearing regarding the two children was held before Magistrate Judge Debra A. Heise on August 21, 2013, with Father and Mother represented by separate counsel. After the hearing, the court ordered that custody of the two children be vested in the Department for an indeterminate period not to exceed each child's eighteenth birthday. The court later ordered that the petition be amended to include the oldest daughter in the proceedings. On September 16, 2013, the prosecutor filed an amended petition to add the oldest child.

The Department proposed separate case plans for Father and Mother. At a hearing held before Judge Meulenberg on September 17, 2013, Mother appeared with counsel and accepted her case plan. Father's counsel was present, and Father appeared by telephone. Father's case plan described the areas of concern as follows:

> [Father] was convicted of Use of Interstate Facilities in commission of Murder-for-Hire, and has been incarcerated in Federal prison for 7 years as of the date of this plan. In addition, there are six reports concerning abuse of a child and one report of sexual abuse of a child in which [Father] was named as the alleged perpetrator. [Father] has demonstrated significant mental health issues through threatening behaviors, chaotic and intimidating letters addressed to [Mother], his daughters, and prior Department social worker. . . .

The case plan provided that Father would complete various tasks, including that he would obtain a full neuro-psychological evaluation within sixty days of his release from prison; that he would have no contact with the three daughters until he is engaged in treatment after his release from prison; and that he would not attempt to intimidate Mother, the daughters, or any Department social worker. Father objected to the recommended tasks and asserted that his conviction had nothing to do with his parenting abilities. The matter was scheduled for another hearing on February 25, 2014, to address Father's objections. On December 12 and 19, 2013, Father filed requests for appointment of a different attorney to represent him. On December 30, 2013, the court appointed a new attorney for Father.

At the hearing on February 25, 2014, before Judge Meulenberg, Father appeared by telephone and took the position that he would not participate in the case plan unless he was permitted to have contact with his daughters. He also stated that he wanted a new attorney. The court attempted to discuss the case plan with Father, but he interrupted the court and stated that the reports were false and contrived and that he was being asked to do things that were unnecessary and inappropriate. The court found that the case plan was the best reasonably available option for the protection of the children and adopted the plan. The following day,

3

Father's counsel moved to withdraw, and several days later Father moved to discharge his attorney and requested that Monica Flood Brennan be appointed to represent him. The court granted the motions and appointed Ms. Brennan to represent Father.

Judge Meulenberg continued having scheduled review hearings in the case, at which Father appeared by telephone and Ms. Brennan appeared for him in person. On August 5, September 2, and September 29, 2014, Judge Meulenberg held a permanency hearing at which Father appeared by telephone and through Ms. Brennan. At the conclusion of the hearing, the court adopted a permanency plan, which included a provision that the Department commence proceedings to terminate Father's parental rights in all three children. The court found that such plan was in the best interests of the children because:

> These three young women have been traumatized. They have depression, post-traumatic stress disorder, behavioral issues, eating disorders, and suicidal ideation. Sexual abuse allegations have been made against the father and the mother. All three children have consistently expressed fear of [Father] and desire to have no communication with him. This family is not in a place where reunification is possible at this time. Further, it is in the best interest of the children to be in separate homes at this time.

In October, Father was released from prison and began residing with his adult son in Arizona.

On January 13, 2015, Ms. Brennan filed a motion asking the court to reconsider its decision that the Department should commence termination proceedings. On May 22, 2015, the court issued an order denying reconsideration.

On June 16, 2015, the Department filed a petition to terminate Father's parental rights in the children. The evidentiary hearing on the petition was scheduled before Judge Heise for five consecutive days, from August 31 through September 4, 2015. The evidentiary hearing extended beyond the scheduled five days to include three days in October (14–16) and six days in January 2016 (19–22 and 28–29). Following the hearing, the court issued a written decision finding that the Department had proved, by clear and convincing evidence, three independent grounds for terminating Father's parental rights. Father then appealed. Pursuant to Father's request, his appeal also included the CPA proceedings.

## II.
## Only One Ground for Termination Will Be Addressed on Appeal.

4

"The trial court must find that grounds for terminating parental rights have been proved by clear and convincing evidence." *Dep't of Health and Welfare v. Doe*, 149 Idaho 207, 210, 233 P.3d 138, 141 (2010). "On appeal, the appellate court does not reweigh the evidence to determine if it was clear and convincing." *Id*. "In an action to terminate parental rights where a trial court has noted explicitly and applied a clear and convincing standard, an appellate court will not disturb the trial court's findings unless they are not supported by substantial and competent evidence." *State v. Doe*, 144 Idaho 534, 535, 164 P.3d 814, 815 (2007). "Substantial and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion." *Anderson v. Harper's, Inc*., 143 Idaho 193, 195, 141 P.3d 1062, 1064 (2006). "It is the province of the trial court to determine the credibility of witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence." *KMST, LLC v. Cnty. of Ada*, 138 Idaho 577, 581, 67 P.3d 56, 60 (2003).

The Department alleged the following six grounds for terminating Father's parental rights:

a. The parent[s] has/have abandoned the children by willfully failing to maintain a normal parental relationship, including but not limited to reasonable support or regular personal contact and/or;
b. The parent[s] has/have abandoned the children by willfully failing to maintain a normal parental relationship with the children for a period of one year or longer and/or;
c. The parent[s] has/have neglected the children as defined in Idaho Code § 16-1602(25) and/or;
d. The parent[s] has/have neglected the children because the parents have failed to comply with the court's orders in a children protective act case or the case plan, and reunification of the children with their parent[s] has not occurred within the time standards set forth in Idaho Code § 16-1629(9) and/or:
e. The parent[s] are unable to discharge parental responsibilities and such inability will continue for a prolonged, indeterminate period and will be injurious to the health, morals or well-being of the children and/or:
f. Termination is in the best interest of the parent[s] and the children.

The magistrate court found that the Department had proved three of those grounds: (1) Father had neglected the children by engaging in conduct defined in Idaho Code section 16-1602(28), I.C. §§ 16-2005(1)(b), 16-2002(3)(a); (2) Father had neglected the children by failing to comply with the case plan in the CPA proceedings, I.C. §§ 16-2005(1)(b), 16-2002(3)(b); and (3) termination of the parent-child relationship was in the best interest of Father and the children, I.C. § 16-2005(3). The statutory grounds are independent, and a finding of any one of them is a

sufficient basis upon which to terminate parental rights. *Matter of Aragon*, 120 Idaho 606, 611, 818 P.2d 310, 315 (1991); I.C. § 16-2005(1).

On appeal, Ms. Brennan does not mention or address the third ground upon which the court terminated Father's parental rights. She argues that there was insufficient evidence of abandonment by Father (a ground alleged by Department but not found by the court), of neglect by Father during his incarceration, and of abuse committed by Father (a ground alleged by Department but not found by the court). She also addresses at length Father's compliance with his case plan or reasons for not complying. However, she does not mention or directly address the third ground for termination—that termination was in the best interests of Father and the children. When a judgment is granted on alternative grounds and one of them is not addressed on appeal, we must affirm the judgment. *Cuevas v. Barraza*, 155 Idaho 962, 964–65, 318 P.3d 952, 954–55 (2014). Therefore, we will address the issues raised on appeal only insofar that they relate to the third ground.

## III.
### Did the Magistrate Court Err in the CPA Proceedings by Denying Father's Motion for Appointment of an Expert?

On November 6, 2014, Judge Meulenberg issued the order adopting the permanency plan that included the provision that the Department would initiate proceedings to terminate Father's parental rights. On December 9, 2014, Ms. Brennan filed on behalf of Father a motion to appoint a named expert who had a master's degree in the field of social work "to facilitate the children speaking with and being reunited with their father." The motion did not request oral argument, and Ms. Brennan did not have the motion heard until April 29, 2015. The court denied the motion, stating the reasons therefor on the record.

A trial court's discretionary decision "will be upheld if it appears that the trial court (1) correctly perceived the issue as discretionary, (2) acted within the boundaries of its discretion and consistent with the applicable legal standards, and (3) reached its determination through an exercise of reason." *Idaho Dep't of Health & Welfare v. Doe*, 149 Idaho 474, 477, 235 P.3d 1195, 1198 (2010). Ms. Brennan asserts that the court erred in failing to grant the motion, but she does not even address the court's reasoning for denying it. Ms. Brennan had the burden of showing that the court abused its discretion in denying the motion. Without even addressing the

6

court's reasoning, she has failed to show an abuse of discretion. A party waives an issue on appeal that is not supported by both argument and authority. *Doe I v. Doe*, 138 Idaho 893, 908, 71 P.3d 1040, 1055 (2003). Therefore, we will not consider this issue.

## IV.
**Was Father Denied Due Process by the Magistrate Court's Denial of His Motion for a Continuance?**

On November 6, 2014, Judge Meulenberg issued the order adopting the permanency plan that included the provision that the Department would initiate proceedings to terminate Father's parental rights. On June 16, 2015, the Department filed the petition to terminate Father's parental rights. The evidentiary hearing on the petition was scheduled before Judge Heise for five consecutive days, from August 31 through September 4, 2015. On July 21, 2015, the Department filed a pretrial compliance document listing the exhibits it intended to offer at the evidentiary hearing and the names of the witnesses it intended to call. On August 3, 2015, the Department filed an amended pretrial compliance document adding additional documents and witnesses and adding telephone numbers for eleven of the witnesses listed.

Father and Mother both filed motions to continue the hearing, which were heard on August 5, 2015. During argument on the motion filed by Ms. Brennan, the court stated, "So this should be no surprise to you or to your client." She responded: "It's not a surprise at all, Judge. I knew they were going to file a termination." Ms. Brennan asserted the reasons for why she needed more time to prepare, and the court asked whether she had filed a request for discovery. She responded, "I haven't done it yet." The court then asked Ms. Brennan, "But you knew it's coming, and so then my other question is have you asked Ms. Rosen [the Department's counsel] if you can have access to the evidence that she's going to offer?" Ms. Brennan answered, "I can do that, Judge." In response, Ms. Rosen stated, "The evidence that the Department intends to present or the State intends to present is largely, as the Court is aware, related to the evidence that has been continuously provided to the child protection judge and to which these attorneys have had access." Ms. Rosen referred the court to an amended pretrial compliance document and stated that the additions to the document were in bold, showing that there were not really any surprises. She then recounted the disclosures listed in the prior document and stated that she would accommodate Ms. Brennan in obtaining whatever she needs. During oral argument on

appeal, Ms. Rosen stated that Ms. Brennan never contacted her to ask for any documents or information.

After the court denied the continuance, Ms. Brennan asked for another status conference prior to trial. The court set that conference on August 18, 2015. At that conference, Ms. Brennan withdrew her request for a continuance because Father did not want one. On August 31, 2015, Father filed a document pro se in which he stated that he objected "because this Court has rendered ineffective his Counsel at law, Attorney Monica Brennan, by disallowing adequate trial preparation time in refusing to consider the size and complexity of the material(s) in the case." The court brought up that filing on January 19, 2016, the seventh day of trial, and asked Father if he was objecting to having Ms. Brennan as his attorney or was contending that the court's rulings were rendering her ineffective. Father responded, "Well, it was the time element at the time which would render her ineffective, but that seems to have been remedied with the continuances that have occurred since that was filed."

"Due process requires an opportunity upon reasonable notice for a fair hearing before an impartial tribunal." *Elias-Cruz v. Idaho Dep't of Transp*., 153 Idaho 200, 204, 280 P.3d 703, 707 (2012). In her argument that her client was denied due process, Ms. Brennan mentions the court's initial denial of her motion for a continuance, but she does not mention either her later withdrawal of that motion or Father's later statement that the extension of the evidentiary hearing into January 2016 remedied the issue. Any analysis of an alleged denial of due process must be based upon the relevant facts. Because Ms. Brennan has not supported this assignment of error with argument and authority based upon the relevant facts, we will not consider this issue. *VanderWal v. Albar, Inc*., 154 Idaho 816, 822–23, 303 P.3d 175, 181–82 (2013).

**V.**
**Did the Magistrate Court Err in Failing to Consider the Best Interests of the Children?**

As stated above, the magistrate court expressly found that "termination of parental rights is in the best interests of both the children and [Father]." Ms. Brennan asserts, "The trial Court erred in not mentioning the Best Interest of the Children." That assertion is false. In its decision, the court expressly explained why it found that termination was in the best interests of both Father and the children.

8

Finally, termination of parental rights is in the best interests of both the children and [Father]. In this case, both the IDHW caseworker and the CASA GAL testified that termination of [Father]'s parental rights is in the children's best interests. All three children, although doing significantly better now than when they were sheltered, continue to need mental health services, something which [Father] does not support. In fact, as reflected by the contents of [Father]'s letters to the girls, his interaction would exacerbate their mental health issues. [The two older daughters] are assimilated into their respective foster homes, both of which are likely to become permanent placements, and placements where both girls want to be. [The youngest daughter] is most closely bonded with her mother and wants to return to her. [Mother] has demonstrated a willingness to work with the Department to meet [the youngest daughter]'s needs. All parties, including [Father], will benefit from a sense of finality, normalcy and permanency, if [Father]'s parental rights are terminated. Termination will allow [Father] to work on his own mental health issues, something which he has both denied and ignored.

Ms. Brennan did not acknowledge the court's reasoning, much less address it. Therefore, this issue is waived, and we will not address it. *Id*.

## VI.
### Did the Magistrate Court Fail to Consider Father's Defenses?

Ms. Brennan alleges that at the evidentiary hearing, "[Father] asserted many different issues in his defense. None of the defenses presented by [Father] at or before trial were considered by the Magistrates. The magistrate demonstrated that she was not considering his arguments by failing to mention them at all in her decision." This statement is simply false. The court's decision included a three-page section titled "VIII. LEGAL ANALYSIS OF [FATHER]'S DEFENSES" in which the court addressed each of the five defenses raised by Father and found them without merit. The court listed those defenses as follows:

- Large portion of evidence should not be considered due to Res Judicata and age of the evidence.
- Court cannot terminate [Father]'s parental rights based on incarceration alone, and there is insufficient evidence that [Father] has neglected his children.
- State has made no effort to reunify [Father] with his children.
- [Father]'s conviction alone cannot be used for termination.
- State acted in bad faith by purposefully misleading the Court about termination of [Mother]'s parental rights and using the system to terminate [Father]'s parental rights without cause.

The only defense addressed by Ms. Brennan in the opening brief is the defense of res judicata. She contends that there was a lawsuit filed in 2005 seeking to terminate Father's parental rights, which was later dismissed. She contends that the dismissal of that case should have precluded the introduction of evidence of events that predated the dismissal. She makes seemingly conflicting assertions about the existence of such termination proceedings.

> [Father] further asserted that the State had already attempted to terminate his parental rights at the time of his federal conviction, and chose not to do so. . . .
>
> . . . .
>
> [Father] asserts that if Health and Welfare had attempted to terminate his parental rights after he was first sentenced, he would have been able to defend the allegations because the witnesses could remember the events that happened and he would be able to have a reasonable alibi.

The magistrate court found that the Department had filed a CPA proceeding in 2005 and that it had been dismissed on the Department's motion on October 2, 2008, pursuant to then Idaho Code section 16-1622(6), which permitted the Department in CPA proceedings to "move the court at any time to vacate any order placing a child in its custody or under its protective supervision." Ch. 223, § 4, 2007 Idaho Sess. Laws 672, 673. The court found that Father had failed to prove that a termination proceeding had previously been filed. Father did not provide any alleged judgment upon which to base a claim of res judicata. In her opening brief, Ms. Brennan does not point to anything in the record supporting her assertion regarding res judicata. Therefore, we will not consider it. *VanderWal v. Albar, Inc.*, 154 Idaho at 822–23, 303 P.3d at 181–82.

## VII.
### Did the Magistrate Court Discriminate Against Father Based upon His Religious Beliefs?

One of the provisions in Father's case plan stated that he was not to attempt to intimidate or threaten any Department employee. During the evidentiary hearing, Ms. Rosen asked him about letters to the Department's caseworker that might appear to be threatening. In answering those questions, he stated, "But there was a lot of writing and, yeah, I suppose you could find every so often a sentence that might be interpreted as a threat."

In support of this issue, Ms. Brennan states:

> The magistrate also points out that [Father] also stated that "all those responsible will receive the fullness of time starting with the laws of Karma."

This again, is in keeping with his Christian Faith. He is not asserting physical violence or any type of physical threat, but rather the old Christian tenet that "What goes around comes around." . . .

The magistrate also states that [Father] is threatening when he states that IDHW is allowing his children to be "destroyed" by "errorful and ungodly influences." [Citations to court's decision omitted.]

The two examples quoted by Ms. Brennan come from two letters that Father wrote to the Department caseworker. The court quoted those excerpts as follows:

- State's Exhibit 50—in a letter dated 11/30/2013, [Father] tells [the Department caseworker], "I do not believe a word of your letter, madam. As matters now stand between us there can be no trust. Due to the history of the Department and its unethical even at times illicit conduct toward me there can be nothing but animosity from me towards the Department. Of course I have small reservations about judging your intentions and motives since you have not [yet] done me any wrong that I can identify inasmuch as your actions have been based on your (sic) being deceived and misled—and you have no evil or fault in being lied to except in being stupid enough to accept lies as truth. Be that as it may, all those responsible will receive their just desserts in the fullness of time starting with the law of karma…" [Emphases in original.]

- State's Exhibit 48—in a letter to [the Department caseworker] dated 1/27/2014, [Father] states, "The ideas of the IdHW are destructive and are allowing my children to be destroyed by errorful and ungodly influences and in the long run their end will be destruction leading our of IdHW (and [Mother]'s) involvement in their lives…In the short term, if IdHW fails to physically keep safe my children and one or more of them dies or is killed, what do you think I will do, regardless of the circumstances, after all this? I suggest the IdHW double its efforts to oversee the safety of these kids."

The court determined that these and other letters written by Father showed a violation of one provision in the case plan, which was related to the finding of neglect based upon the failure to comply with the case plan. As explained above, that is not an issue that we need to address on appeal.

Ms. Brennan also contends that Father was criticized for his religion based upon a question asked by counsel for CASA. Ms. Brennan states: "He was asked why he wrote: 'God is the ultimate ruler and just below that is the father's word.' He responded that the scripture states that the wife should submit to the husband." (Citation omitted.)

11

According to Ms. Brennan, "By commenting on these biblical passages in a derogatory way, the state, counsel for CASA and the Court discriminated against [Father] for his religious beliefs in violation of the First Amendment." Ms. Brennan makes this assertion, but she has not provided argument and authority showing how any of this constituted a violation of Father's free exercise of religion. Because Ms. Brennan has not supported this assignment of error with argument and authority, we will not consider this issue. *VanderWal*, 154 Idaho at 822–23, 303 P.3d at 181–82.

## VIII.
### Did the Magistrate Court Base Its Ruling upon Facts Not in Evidence?

Ms. Brennan asserts that Judge Heise cited documents in her decision that were not properly entered in the record. The statement to which Ms. Brennan refers was the court's quotation of a paragraph from Father's case plan in that part of the court's decision in which it was recounting what occurred in the CPA proceedings and Father's objections to the case plan. That was not part of the court's findings of fact based upon the evidentiary hearing on the petition for termination. In addition, Father's case plan was admitted into evidence without objection during that hearing. This assertion by Ms. Brennan is frivolous.

Ms. Brennan also accuses Judge Heise of considering facts not in evidence. Ms. Brennan claims:

> There was other evidence that the Magistrate was considering Facts not in Evidence. The Court stated regarding [the oldest daughter]:
>
> > THE COURT: She's at LPO. She's at Lake Pend Oreille High School because she was not in the mainstream school. She is at Lake Pend Oreille High School.
> > MS. BRENNAN: Judge, how did you know where the girls are going to school do we have testimony -
> > THE COURT: Because I read it in a report.
> > MS. BRENNAN: Oh. And what report was that?
> > THE COURT: I'll find it.
> > MS BRENNAN: Okay.
>
> However, the Court never produced the report that was relied on, and it does not appear to be anywhere in the trial record.

The facts regarding this allegation are as follows. During the Department's direct examination of a psychologist who had examined the three children, the Department was questioning the psychologist about what her cognitive testing of the oldest child showed. As the psychologist was testifying about her findings, the court asked, "Did you do a written report?" The psychologist answered, "I did, yes," and Ms. Brennan interjected that she had not received a copy of the report. She stated that she did not get the report in discovery, and the Department's attorney responded that she did not receive any discovery requests from Ms. Brennan. The court asked Ms. Brennan whether she had filed any discovery requests, and she responded that she had not. She was relying upon Mother's counsel to do so.

The witness also had reports regarding the other two children, and so the court had six copies made of all of the reports. There was discussion about whether the Department had complied with Mother's discovery requests. Then Ms. Brennan brought up that this was one of the reasons that she did not have enough time to prepare for trial because she had the witness names, but did not know what they were going to say. The court responded: "I think the rules of discovery apply and any one of you could have filed the request to have expert witnesses identified and copies of any reports prepared by the expert in connection with this case."

The psychologist's report regarding the oldest child was marked as Exhibit 100, and a copy was given to all counsel. It was then admitted into evidence without objection.

After Exhibit 100 was admitted, there was a recess taken and later a break so that Ms. Brennan could read the next report (Exhibit 101). Counsel for the guardian ad litem then cross-examined the psychologist, followed by Mother's counsel. During questioning by Mother's counsel about the oldest daughter's cognitive issues, the following occurred:

> MOTHER'S COUNSEL: Q. She does very well in school, I'm told.
> WITNESS: A. Uh-huh.
> MOTHER'S COUNSEL: Q. Please explain to me how she does that if she's—
> WITNESS: A. Sure. So school oftentimes will accommodate kids who have different cognitive issues. I'm not sure if that's happening for her.
> THE COURT: She's at LPO. She's at Lake Pend Oreille High School because she was not in the mainstream school. She is at Lake Pend Oreille High School.

When it was Ms. Brennan's turn to cross-examine the witness, she asked the court how it knew that the girl was in that school. The following exchange occurred:

MS. BRENNAN:  Judge, how did you know where the girls are going to school?  Do we have testimony—

THE COURT:  Because I read it in a report.

MS. BRENNAN: Oh.  And what report was that?

THE COURT:  I'll find it.

MS. BRENNAN: Okay.

THE COURT:  I'm making notes and I—

MS. BRENNAN:  I just don't remember there being any testimony about that.

THE COURT:  Well, there's lots of stuff in evidence that I've been reading and I—it's not like I'm talking to anybody, I'll tell you that.

. . . .

THE COURT:  I'm reading and taking notes and I'm—and you can see now I'm starting to label my notes.  So I—and I have to do that because if I have these trials that are spread out, I can't remember things.  So I—but no, I—

MS. BRENNAN:  I was just curious—

THE COURT:  I am paying attention. I want everybody to know I am paying attention.

The second page of the psychologist's report, which had shortly before been admitted into evidence as Exhibit 100 and which the court had obviously been reading, states, "[The oldest daughter] is in tenth grade at Lake Pend Oreille Alternative High School."  Thus, Ms. Brennan's accusation regarding Judge Heise is again groundless.

## IX.
## Conclusion.

We affirm the judgment of the magistrate court and award costs on appeal to the Department.